NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>v.<br><br>SHAROD BROWN,<br><br>           Defendant. | Criminal Action No.: 08-622 (JLL)<br><br>**OPINION** |

**LINARES**, District Judge.

Defendant Sharod Brown has been charged with possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).  On June 22, 2009, Defendant submitted several pretrial motions, including a motion for a pretrial determination of the admissibility of evidence pursuant to Federal Rules of Evidence 609(a)(1) and (2) and a motion to suppress evidence.  By Order dated July 9, 2009, this Court disposed of all of the pretrial motions except these two items, granting a hearing on them.  On December 17, 2009, this Court heard argument on the admissibility of the Rule 609 evidence and heard argument and testimony on the motion to suppress.  The Court ruled on the record that Defendant's prior drug convictions are admissible under Rule 609 in the event he testifies at trial, subject to a limiting jury instruction.  Therefore, the only remaining issue before the Court is Defendant's motion to suppress evidence.  This Court has considered the evidence presented at the December 17 hearing and the submissions made in support of and in opposition to Defendant's motion to suppress.  For the reasons set

forth below, this Court grants Defendant's motion to suppress the evidence.

**I.    BACKGROUND**

At the December 17 hearing Detective Janet Santiago and Denise Ford testified. It is undisputed that on June 6, 2008, at between 6:00AM and 7:00AM numerous officers from the Newark police department's gang unit and the DEA went to the apartment of Ms. Ford. At some point, the officers searched her apartment, found a gun, and arrested Defendant, who was at the apartment at the time. The officers did not have a warrant to search the apartment, and both Detective Santiago and Ms. Ford testified that officers entered Ms. Ford's apartment prior to her signing any consent form. At some point during her interaction with the officers, Ms. Ford signed a consent to search form. The parties contest whether Ms. Ford's consent, as evinced by the signed form, was knowing and voluntary.

Ms. Ford provided an affidavit to this Court stating that she did not give the officers permission to search her apartment, and that she "was not informed that [she] was signing a consent to search form and any form which [she] was asked to execute was not executed until after the search of [her] apartment." (Aff. of Denise Ford ¶ 2.) She also testified at the December 17 hearing that an officer told her that the officer "had a paper for [her] to sign to protect [her] kids from going to DYFS and from [her] going to jail." (Tr. 88:13-14.) She testified on cross examination that when the form was handed her to sign it was folded in half, with only the signature line and a blank inventory area visible. (Id. at 108:11-109:9.) Detective Santiago testified that all of the handwritten entries on the form were completed either by her or Lieutenant Roman; only the signature was completed by Ms. Ford. (Id. at 32:19-35-3.)

Detective Santiago testified that the officers went to Ms Ford's apartment to investigate a

tip that a Crip gang member was dealing drugs out of the apartment. She testified that the officers did not have a search warrant, did not set up surveillance, and did not attempt an undercover buy and bust. The officers' pre-determined plan for "further investig[ation] of the complaint of narcotics being sold" was to knock on Ms. Ford's door and inform Ms. Ford and whoever else was in the apartment that the group of gang unit and DEA officers were there "to investigate drug activity." (Id. at 65:6-67:8.) Detective Santiago acknowledged that the officers "were not going to get into [the] apartment without [Ms. Ford's] consent." (Id. at 68:2-4.) But, contrary to Ms. Ford's testimony, Detective Santiago testified that Ms. Ford first verbally consented to the officers conducting a protective visual sweep of the apartment and then voluntarily signed the form consenting to the officers conducting a more thorough search of the apartment. Detective Santiago testified that the officers never threatened Ms. Ford regarding the search. (See id. at 43:18-44:2.) She testified that Ms. Ford understood that the form she signed was providing permission to search the apartment.

     The incident report states that the gun was found pursuant to a "systematic visual sweep . . . in plain view, sitting atop an open kitchen shelf." At the December 17 hearing Detective Santiago testified that there was no systematic visual sweep. She testified that there was an initial protective visual sweep of the apartment and then a subsequent systematic search of the apartment. She testified that during the visual protective sweep, officers went into the kitchen. The gun was not found at that time. Detective Santiago testified that the gun was found in the kitchen on an open shelf during the later systematic search. No drugs were found in the apartment. Defendant presently argues that the consent to search was not valid and seeks to exclude the gun found in Ms. Ford's apartment.

## II.     LEGAL ANALYSIS

The Government argued in its opposition brief that Defendant does not have standing to contest the search.  At the December 17 hearing, the Government reiterated this argument, stating: "[T]he defense has not either in the Ford affidavit or otherwise stated or even alleged that Mr. Brown lived at the [apartment] or spent occasionally nights [there]." (Tr. at 13:10-13.) Defendant's attorney argued that it relied on the police report to establish Defendant's standing. The incident report states that Ms. Ford told the officers that Defendant "did occasionally stay the night." Ms. Brown also testified that Defendant occasionally stayed the night at the apartment, with Ms. Ford, their child, and Ms. Ford's other child.

Whether a person has standing to contest a search, "depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." Minnesota v. Olson, 495 U.S. 91, 95 (1990) (alteration in original).  "[S]tatus as an overnight guest is alone enough to show that [a person] had an expectation of privacy in the home that society is prepared to recognize as reasonable" to confer standing to contest the legality of a search.  Id., at 96-97; see also United States v. Perez, 280 F.3d 318, 337 (3d Cir. 2002).  Here, Defendant was the father of one of Ms. Ford's children who resided at the apartment.  The incident report taken together with Ms. Ford's testimony establish that Defendant stayed overnight at Ms. Ford's "from time to time." (Tr. 85:18-19.)  The Court finds that Defendant has standing to contest the search.

Defendant argues that the search was illegal because there was no warrant and Ms. Ford did not consent to the search.  To the extent that she signed a consent to search form, the defense argues that Ms. Ford did not know she was consenting to a search of her apartment, that her

signature on the form was not voluntary, and that, in any case, the search was conducted prior to her signing the form. If a consent to search is voluntary, a warrantless search is permissible under the Fourth Amendment and evidence seized will be admissible. See Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973); United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003). "The government has the burden of proving by a preponderance of the evidence that the search was made pursuant to a voluntary consent." United States v. Velasquez, 885 F.2d 1076, 1081 (3d Cir. 1989) In determining whether a consent to search is voluntary, a court must look at the totality of the circumstances. Schneckloth, 412 U.S. at 226. "[T]he critical factors comprising a totality of the circumstances inquiry . . . includ[e] the setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting individual." Givan, 320 F.3d at 459.

In this case, Detective Santiago's and Ms. Ford's testimony conflict, and Ms. Ford's testimony includes facts, which if believed, support a finding that her signature on the consent to search form was not voluntary or knowing. The Government argues that knowledge is not a necessary requirement for the search to be valid. The Government is correct that while "knowledge of the right to refuse consent is one factor to be taken into account, the [G]overnment need not establish such knowledge as the sine qua non of an effective consent." Schneckloth, 412 U.S. at 227. But, this is not the type of knowledge that is at issue here. Ms. Ford states that she did not know that the form she was signing was a consent to search form. It cannot be reasonably argued that a consent is a voluntary consent to *search* if the person is not informed that the form she is signing is a search form. Thus, as the Government acknowledged, here, the question of whether the search of Ms. Ford's apartment was permissible simply depends

on the credibility determination of the two witnesses.  If Ms. Ford's testimony is found to be more credible, the consent was not voluntary.

      Ms. Ford testified that at least eight officers came to her door and told her that "they were getting complaints that [Defendant] was selling drugs out of [the] apartment." (Tr. 87:14.)  She testified that she told them it was not true and then asked to put clothes on but was told that she could not do so.  She stated that the officers "barg[ed] their way in through the door . . . [and] started searching [her] apartment." (Id. at 87:10-12.)  She was then led into the hallway of the building with some officers.  She testified that she was told: "[I]f I signed this paper right now, I wouldn't go to jail, and my kids wouldn't go to DYFS, if I signed that particular paper." (Id. at 91:20-22; see also id. at 88:13-14.)  She testified that the officers did not explain the form to her.  She also testified that the officers never asked permission before entering her apartment.

      Aside from a few cursory questions, the Government did not question Ms. Ford on the events surrounding the search.  Therefore, the Government's questioning of Ms. Ford did not highlight to the Court any internal inconsistencies in Ms. Ford's testimony regarding the search.  Also, Ms. Ford's testimony on direct examination and on questioning by the Court was internally consistent, albeit different than Detective Santiago's version of events.  The Government sought to attack Ms. Ford's credibility more generally, arguing that she should not be believed based on: (1) her relationship to the defendant, including their child together and her desire to have him not go to jail for a long time, (2) her affidavit, and (3) her housing lease.

      With respect to Ms. Ford's affidavit, the Government's questioning merely highlighted that the affidavit did not contain a full recital of the facts surrounding the event in question.  The Government did not illicit any testimony that anything in the short affidavit was incorrect or

conflicted with her testimony. Her affidavit was consistent with her testimony. With respect to her Newark Housing Authority lease, the Government argues that in 2003, by signing the lease, Ms. Ford agreed to update the list of apartment occupants should the people residing in the apartment or staying in the apartment for an extended period of time change. The Government argues that she did not update her lease as she agreed, and, thus, she was lying to the housing authority, supporting a finding that her credibility in general is questionable. The lease indicated only that she and her oldest child occupied the apartment. It did not include her youngest child, born after 2003, or Defendant as occupants or extended visitors. The Court is not persuaded that the failure to update the lease, even if such an update was required for Defendant, indicates a general untrustworthiness of Ms. Ford. Therefore, because neither the Government's nor this Court's questioning of Ms. Ford identified any internal inconsistencies in Ms. Ford's testimony and because the Government did not establish that Ms. Ford provided any inaccurate information in her affidavit, the only real question posed for this Court is whether Ms. Ford's relationship to Defendant, her general demeanor at the December 17 hearing, and her overall version of the events surrounding the search convince this Court that her testimony is not credible when compared to Detective Santiago's testimony.

Detective Santiago's testimony was inconsistent with the incident report in significant respects. First, the incident report, completed by Detective Santiago shortly after the search, stated that Ms. Ford signed the consent form prior to any search. Second, it indicates that there was one, systematic visual search in which a gun was found in the kitchen in plain view. On the other hand, Detective Santiago's testimony at the December 17 hearing was that, after verbal consent, officers initially did a visual protective sweep of the apartment and then later conducted

a more thorough systematic search. Additionally, her testimony was internally inconsistent or unlikely in certain respects. Detective Santiago testified that, even though numerous officers from the gang unit and the DEA went to the apartment very early in the morning without a warrant or any plan to engage in surveillance or a buy and bust, they did not bring a consent form with them to the door. Thus, they did not have a consent form ready even though they knew they could legally obtain access to the apartment to further investigate drug activity only through a consent to search. Also, she testified that Ms. Ford was irate and cussing and ranting at the officers, yet then read and studied the consent form for some time, understood that she was consenting to a search of the apartment, and agreed to let the officers conduct the search. She testified that it was her and Lieutenant Roman who completed the form, with Ms. Ford simply signing it. She also testified that an officer looked in the kitchen during the protective sweep, but that the gun was discovered, in plain sight, only during the second search, after the form was signed.

After balancing the testimony of Ms. Ford and Detective Santiago and consideration of the submissions and evidence, this Court finds that the totality of the circumstances supports a finding that Ms. Ford's consent was not voluntary. The Court finds the following facts significant: the time of the incident; the number and types of officers involved; the fact that the officers had a specific target prior to coming to the apartment yet had no plan for a method of further investigation that did not involve obtaining access to the apartment; the fact that the officers reported that the gun was ultimately found in plain view even though they allegedly conducted a visual sweep of the kitchen earlier and did not find the gun; the threat of DYFS involvement; and the way the form was given to Ms. Ford, completely filled out by the officers

and folded over showing only the signature line. The Court finds that the Government has not met its burden that Ms. Ford knew she was consenting to a search of her apartment, as opposed to just signing a form the officers were insisting she sign so they would go away. Additionally, even if she knew the form was a consent to search form, the Court finds that, under the circumstances, the Government has not met its burden that Ms. Ford's acquiescence was voluntary as opposed to given under the threat of her children being taken away by DYFS. Therefore, the gun seized as a result of the search is suppressed.

### III. CONCLUSION

Based on the reasons set forth above, Defendant's motion to suppress the gun found in Ms. Ford's apartment is granted. An appropriate Order accompanies this Opinion.


DATED: December 30, 2009                   /s/ Jose L. Linares
                                           JOSE L. LINARES
                                           UNITED STATES DISTRICT JUDGE